**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil Action No. 13-1629 (BAH) |
| v. | Judge Beryl A. Howell |
| MICHAEL D.J. EISENBERG, | |
| Defendant. | |

**MEMORANDUM OPINION**

The United States initiated this suit to recover funds under Section 8132 of the Federal

Employees' Compensation Act ("FECA"), 5 U.S.C. § 8101 *et seq.*, from defendant Michael D.J.

Eisenberg, who is an attorney licensed to practice law in the District of Columbia and is

proceeding *pro se* in this action. Eisenberg successfully obtained a settlement award for his

former client, and now-third-party defendant, Gregory Thompson, in a lawsuit captioned,

*Thompson v. Wackenhut Corp.*, No. 1:09-cv-01113-GBL-TRJ (E.D. Va. Oct. 2, 2009)

("*Wackenhut* suit"), for injuries Thompson suffered from a slip-and-fall accident. Eisenberg

failed, however, to refund to the government the amount of workmen's compensation paid to

Thompson under the FECA. The United States alleges that, under 5 U.S.C. § 8132, Eisenberg

was required to refund to the United States funds totaling $96,295.15 prior to disbursing the

settlement funds obtained in the third-party suit. Pending before the Court are three motions: (1)

the United States' Motion for Partial Judgment on the Pleadings and for Partial Summary

Judgment ("Pl.'s Mot."), ECF No. 26; (2) Eisenberg's Motion for Leave to File Counterclaim

Against the United States of America ("Def.'s Counterclaim Mot."), ECF No. 62; and (3)

Eisenberg's Opposed Motion to Amend Answer ("Def.'s Answer Mot."), ECF No. 86. For the

reasons discussed below, Eisenberg's motions are denied, and the United States' motion is granted in part and denied in part.[1]

## I.   BACKGROUND

The following facts derive from the whole record, including the parties' various statements of material facts, briefs, exhibits, and other evidence in the record.

### A.   FECA Claim

Gregory Thompson, an employee of the U.S. Department of the Navy, was injured in a slip-and-fall accident on December 6, 2007.  Pl.'s Statement Material Facts Supp. Mot. J. Pleadings & Partial Summ. J ("Pl.'s SMF") ¶ 7, ECF No. 26-1; Def.'s Material Facts ("Def.'s SMF") at 7, ECF No. 85; Def.'s Counterclaim Against the United States of America ("Def.'s Proposed Counterclaim") ¶ 10, ECF No. 62-2.  After the accident, pursuant to the FECA, Thompson filed a claim with the Department of Labor ("DOL") Office of Workers' Compensation Programs ("OWCP") for medical benefits and lost wages related to the injuries caused by the accident.  Pl.'s SMF ¶ 8; Def.'s SMF at 7.[2]  By letter dated February 19, 2008, Thompson received notification from OWCP that his claim had been accepted.  Def.'s Mem. Supp. Opp'n Pl.'s Mot. Partial J. Pleadings & Partial Summ. J. ("Def's Mem."), Ex. A

---

[1]     Eisenberg has requested oral argument on his pending motions, *see* Def.'s Reply Pl.'s Opp'n Def.'s Mot. Amend Answer ("Def.'s Reply") at 1, ECF No. 89, but given the sufficiency of the parties' written submissions to resolve the pending motions, this request is denied, *see* Local Civil Rule 7(f) (allowance of oral hearing is "within the discretion of the court").

[2]     The United States repeatedly asserts as undisputed that Eisenberg represented Thompson with respect to his initial FECA claim, *see, e.g.*, Pl.'s Mem. Supp. Mot. Partial J. Pleadings & Partial Summ. J. ("Pl.'s Mem.") at 1 (citing Compl. ¶¶ 6, 9; Answer ¶¶ 6, 9), ECF No. 26; Pl.'s Opp'n Def.'s Mot. File Counterclaim ("Pl.'s Opp'n Counterclaim") at 2 (same), ECF No. 64, but the record is not so clear, *see* Compl. ¶ 6 ("*Mr. Thompson filed a claim* with the [OWCP] for compensation under the [FECA].  He sought medical benefits and lost wages related to the injuries caused by the accident.") (emphasis added); *id.* ¶ 9 ("Mr. Thompson brought suit against a third party, Wackenhut Services, Inc., alleging that Wackenhut's negligence caused the same slip-and-fall accident for which he received FECA benefits.  He retained Mr. Eisenberg as counsel to represent him in *that action*.") (emphasis added); Answer ¶ 6 (admitting plaintiff's allegations in ¶ 6 of the Complaint); *id.* at 9 (admitting plaintiff's allegations in ¶ 9 of the Complaint).  Records submitted in the Wackenhut suit, however, do show that Eisenberg represented Thompson in subsequent administrative actions involving his FECA claim.  *See Wackenhut*, Def. United States' Mot. Dismiss or Summ. J. ("Pl.'s *Wackenhut* Mot."), Exs. E & F, ECF No. 8-2.

("Thompson FECA Claim Acceptance Notice"), ECF No. 84-1.  Over a year later, by letter dated May 28, 2009, on which Eisenberg is copied as Thompson's attorney, Thompson received notice from OWCP that his "claim for medical and wage loss benefits has been terminated effective 06/07/2009."  Def.'s Mem., Ex. B ("Thompson FECA Claim Termination Notice"), ECF No. 84-2.  Thus, OWCP disbursed compensation to Thompson until at least June 7, 2009, when it purportedly terminated his benefits.  *Id.*; *see also* Compl. ¶ 8 (alleging OWCP disbursed compensation to Thompson until June 7, 2009); Pl.'s SMF ¶ 9 (same).[3]

Thompson, represented by Eisenberg, requested reconsideration of OWCP's decision to terminate his benefits, but OCWP denied this request on July 7, 2010.  *See* Def.'s Mem., Ex. C ("Thompson FECA Claim Reconsideration Notice"), ECF No. 84-3.

Notwithstanding OWCP's notification of termination of Thompson's benefits, compensation was apparently paid on behalf of Thompson, at least to medical providers, after June 7, 2009.  For example, DOL payment history reports in the record reflect that while Thompson's lost wages compensation stopped after June 6, 2009, *see* Def.'s Mem., Ex. D ("October 8, 2010 Letter") at 2–6 (attached report of "Compensation Payment History"), ECF No. 84-4; *id.*, Ex. I ("October 4, 2011 Letter") at 50–53 (attached "Payment History Inquiry Report"), ECF No. 84-8; Pl.'s Opp'n Def.'s Mot. Amend Answer ("Pl.'s Opp'n Answer"), Ex. 8 at 46–49 (*Wackenhut*, Def. United States' Mot. Dismiss or Summ. J. ("Pl.'s *Wackenhut* Mot."), Ex. D, ECF No. 8-2) ("Payment History Inquiry Report"), ECF No. 88-1, he continued to receive

---

[3]     To the extent that Eisenberg denies that Thompson received any compensation at all from OWCP, *see, e.g.*, Answer ¶ 7 ("Defendant is uncertain as to the exact monies distributed, *if any*, by Plaintiff to Gregory Thompson.") (emphasis added); Def.'s SMF at 2, ¶ 1 (disputing Pl.'s SMF ¶ 9), his denial is "blatantly contradicted by the record, so that no reasonable jury could believe it," and the Court must "not adopt that version of the facts for the purposes of ruling on [the United States'] motion for summary judgment," *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  Indeed, Eisenberg's own proposed pleading asserts that "the Thompsons applied for *and received moneys* through [DOL]."  Def.'s Proposed Counterclaim ¶ 11 (emphasis added); *see also* Answer ¶ 9 (admitting Eisenberg represented Thompson in a third party lawsuit related to the same accident "for which he [Thompson] *received* FECA benefits") (emphasis added).

medical benefits through February 10, 2011, *see* October 4, 2011 Letter at 40–49 (attached "Bill Pay History Report" showing medical benefits disbursed through February 10, 2011); *see also* Pl.'s Opp'n Answer, Ex. 8 at 40–45 (Pl.'s *Wackenhut* Mot., Ex. C, ECF No. 8-2) ("Bill Pay History Report" showing medical benefits disbursed through August 27, 2009).

B.     **Third Party Lawsuit**

On October 2, 2009, Thompson, represented by Eisenberg, filed suit in the U.S. District Court for the Eastern District of Virginia against a third party, Wackenhut Services, Inc. ("Wackenhut"), and the United States for negligence relating to Thompson's December 6, 2007 slip-and-fall accident. *Wackenhut*, Compl., ECF No. 1;[4] *see also* Pl.'s SMF ¶¶ 10–11; Def.'s SMF at 7; Def.'s Proposed Counterclaim ¶ 10. On December 7, 2009, the United States filed a Motion to Dismiss, or Alternatively, for Summary Judgment ("Pl.'s *Wackenhut* Mot."), *Wackenhut*, ECF No. 7, supported by a Declaration of Antonio A. Rios ("Rios Decl."), *id.*, ECF No. 8-1, Deputy Director for OWCA, together with a detailed accounting, *id.*, Exs. C & D. Rios attested: "Thompson received a total of $94,261.33 disability compensation from January 22, 2008 until June 6, 2009. OWCP also paid $29,451.75 for medical treatment related to the accepted conditions." Rios Decl. ¶ 5; *see* Pl.'s Opp'n Answer at 13 n.9. The court granted the United States' motion on January 15, 2010, dismissing the United States from the suit without prejudice. *Wackenhut*, Order, ECF No. 20.

Thompson and Wackenhut then settled the negligence action for $675,000. Pl.'s SMF ¶ 12; Def.'s SMF at 7. On November 5, 2010, Eisenberg, on behalf of Thompson, filed a Notice of Settlement in the *Wackenhut* suit, *Wackenhut*, ECF No. 234, which was followed by a joint Stipulation of Dismissal With Prejudice, on November 16, 2010, *id.*, ECF No. 235.

---

[4]     An Amended Complaint was later filed alleging the same claim for negligence against the United States and Wackenhut. *Id.*, Amended Compl., ECF No. 27; Pl.'s Opp'n Answer, Ex. 9-A, ECF No. 88-2.

The settlement award was issued jointly to Thompson and Eisenberg's law firm. *See* Def.'s Mem., Ex. E ("Third-Party Lawsuit Settlement Letter") at 2, ECF No. 84-5. Eisenberg admits that "[u]pon receiving the $675,000 from the settlement, [he] distributed the proceeds to Mr. Thompson and paid himself an attorney's fee." Pl.'s SMF ¶ 14; Def.'s SMF at 7.

### C.    Government Refund-Related Correspondence

On October 7, 2010, at Eisenberg's request, *see* Def.'s SMF ¶ 5 (asserting that "[d]efendant did request, as a confirmation what, if any funds, were due through Mr. Thompson"), Thompson wrote a letter to OWCP "requesting the total amount of compensation paid" by OWCP for his case, October 8, 2010 Letter at 1. By letter dated October 8, 2010, Gloria Watson, a Claims Examiner at OWCP, responded to Thompson, attaching "a copy of [his] compensation payment history." *Id.*[5] Handwritten on one copy of the October 8, 2010 letter submitted by Eisenberg in this case, on the bottom right-hand corner, is the phrase, "Workers Comp Payback $52,900.45," along with a second handwritten number "52,900.45" a few lines below the phrase. *Id.* The attached payment history printout of Thompson's "Compensation Payment History," which appears to have been generated that day from the "Employment Standards Administration Federal Employees' Compensation System," *id.* at 2, shows net total payments of $94,261.33 from January 22, 2008 through June 6, 2009, *id.* at 6.

Thompson forwarded Eisenberg a copy of the October 8, 2010 letter without any handwriting, via email on October 14, 2010. Def.'s Mem., Ex. U ("October 14, 2010 Email"), ECF No. 84-19. Eisenberg replied to Thompson the same day, stating: "This appears to include your paycheck as well. You need to contact HR and ask them what benefits you have to payback

---

[5]     Eisenberg submitted the October 8, 2010 letter in both Exhibit D and Exhibit U to his opposition to the United States' motion. *See* Def.'s Mem., Ex. D ("October 8, 2010 Letter") at 1, ECF No. 84-4; *id.*, Ex. U ("October 14, 2010 Email") at 3, ECF No. 84-19.

[sic] (all of them or just medical and/or paycheck, etc) and an exact number of what you owe." *Id.*

Over six months after the settlement of the *Wackenhut* suit, Eisenberg submitted, by letter dated June 9, 2011, a Long Form Statement of Recovery ("SOR") notifying DOL, Office of the Solicitor ("DOL-SOL"), that Thompson had "recently" received a third-party damage award in a settlement against the third-party involved in Thompson's OWCP claim.  Pl.'s Mem. Supp. Mot. Partial J. Pleadings & Partial Summ. J. ("Pl.'s Mem."), Ex. 1 ("June 9, 2011 Letter"), ECF No. 26-2; Def.'s Mem., Ex. F ("June 9, 2011 Letter"), ECF No. 84-6.  Despite being privy both to the *Wackenhut* suit's Rios Declaration, which indicated that compensation totaling $123,713.08 had been paid to Thompson, and to DOL-SOL's October 2010 letter, which stated that compensation paid to Thompson through June 6, 2009 totaled $94,261.33, Eisenberg listed in the SOR an amount of $70,533.93 in OWCP disbursements to Thompson and an amount of $17,633.48 for the government-allowed attorney's fee, reflecting a balance of $52,900.45 to be refunded to OWCP.  *See* June 9, 2011 Letter.  According to Eisenberg, Thompson had "instructed [him] that the amount to be used in the set-aside calculation was $70,533.93," Answer ¶ 18(b); Def.'s First Amended Answer ("Def.'s Proposed Answer") at ¶ 18(b), ECF No. 86-3, and Thompson had relied on the government "to provide him with accurate information to provide Mr. Eisenberg," Answer ¶ 18(c); Def.'s Proposed Answer ¶ 18(c); *see also* Def.'s Mem. at 6 n.8 ("Defendant asserts that Mr. Thompson informed Defendant of this value after Mr. Thompson spoke with DOL."), ECF No. 83-2.  The SOR triggered a lengthy series of communications between Eisenberg and DOL.

A little over a month later, by letter dated July 19, 2011 to Eisenberg, Onetia J. Evans, a DOL-SOL Paralegal Specialist, acknowledged the receipt of the SOR, but raised concern over

the computation of the amount to be refunded.  Pl.'s Mem., Ex. 2 ("July 19, 2011 Letter"), ECF

No. 26-3; Def.'s Mem., Ex. G ("July 19, 2011 Letter"), ECF No. 84-7.  Specifically, DOL

indicated that OWCP had disbursed additional benefits to Thompson in the interim between the

*Wackenhut* suit settlement and the receipt of the SOR, stating:

> Since you did not timely file the required Statement of Recovery to compute the
> Government's statutory right of reimbursement and to establish the surplus, the
> [OWCP] continued to pay benefits to and on behalf of your client.  Current
> disbursements total $128,393.53 as of June 29, 2011.

July 19, 2011 Letter.  Consequently, the letter cautioned:

> If you insist on paying the Government's right of reimbursements in the amount
> of $52,900.45 based on disbursement at the time of the settlement that you
> computed at $70,533.93, there will be an overpayment of $57,859.60 which is
> current disbursements of $128,393.53 minus $70,533.93 disbursements at the
> time of settlement.

*Id.*  In other words, because the SOR was not timely filed, OWCP had disbursed benefits for

Thompson after the October 2010 *Wackenhut* settlement, bringing the total amount of

disbursements to $128,393.93.  The letter attached an amended SOR and demanded payment of a

refund to OWCP in the amount of $96,295.15 within thirty days.  *Id.*

    The next month, on August 16, 2011, Eisenberg spoke with Gertrude G. Gordon, DOL-

SOL's Chief of Subrogation, and requested that she "explain how the numbers on the Statement

of Recovery were reached" in the July 19, 2011 letter.  Pl.'s Mem., Ex. 3 ("August 16, 2011

Letter") at 1, ECF No. 26-4.  Gordon wrote back to Eisenberg "apologize[ing] for any

miscommunications between" Eisenberg and her staff, but reiterating that the SOR "was not

timely filed" and that OWCP "continued to pay benefits to and on behalf of your client," with

"[c]urrent disbursements total[ing] $128,393.52 as of June 29, 2011."  *Id.*  She further explained

that, "since the [OWCP] did not suspend your client's benefits, current disbursements total

$128,393.53 which results in a refund of $96,295.15."  *Id.*  Acknowledging that Eisenberg

"stated that [he had] $52,900.45 ready to pay the Government's statutory right of reimbursement," Gordon asked him to "[p]lease submit this payment within thirty days of your receipt of this letter." *Id.* Eisenberg was cautioned, however, that "the total due is $96,295.15" and, thus, "upon receipt of the $52,900.45, the balance due will be $43,394.70." *Id.* In response to Eisenberg's request for "possible payment of the additional amount with monthly payments," Gordon agreed that DOL would "accept a monthly payment plan," but that the balance of the amount owed "must be paid in full within one year." *Id.*

Two months later, by letter dated October 4, 2011, Evans, the Paralegal Specialist, responded to Eisenberg's "recent request for current disbursement information" for Thompson's FECA claim, stating that the United States had disbursed $98,792.13 in pay compensation and $29,601.40 in medical compensation—a total of $128,393.53 in compensation—as of September 27, 2011. Pl.'s Mem., Ex. 4 ("October 4, 2011 Letter"), ECF No. 26-5; October 4, 2011 Letter at 1.

Subsequently, on October 23, 2011, Eisenberg advised DOL-SOL of "Mr. Thompson's family income and expenses." Def.'s Mem., Ex. J ("October 23, 2011 Correspondence"), ECF No. 84-9; *see* Pl.'s Mem., Ex. 5 ("November 17, 2011 Letter"), ECF No. 26-6; Def.'s Mem., Ex. K ("November 17, 2011 Letter"), ECF No. 84-10. After complaining that DOL had failed to timely contact him and Thompson or "to return [his] calls from nearly six weeks ago," Eisenberg explained that Thompson's financial situation was "strained" such that making even a $100 monthly payment "would create a financial hardship." October 23, 2011 Correspondence. He represented, "[h]owever," that "as a matter of due course and act of good faith, the family is prepared to pay the lump sum amount that was withheld back in November ($52,900.45) and make monthly payments of $100.00." *Id.* Eisenberg further stated,

A good faith effort was made to protect the financial interests of the government when the settlement with the third-party contractor was made. As discussed above, it appears that it was the Agency's error that created the situation the family now finds itself in. I would ask as a matter of compassion that the remaining moneys, after the lump sum withheld back in November is paid ($52,900.45), be waived. If the Government is unwilling to assist this former member of the United States military and nearly 20 year civil servant, the family will agreed [sic] to the payment scheme discussed above. But, if the Government is unwilling to agree to the aforementioned, then the moneys currently being held will need to be used to start monthly payments.

*Id.*

DOL-SOL responded, by letter dated November 17, 2011, that, under section 8132 of the FECA, the government had "no authority to waive or compromise the amount to be refunded" and, consequently, "[t]he amount of compensation paid as of the date of third party settlement in this case is $128,393.53. The Statement of Recovery must be computed based on this disbursement amount which results in a refund owed to the United Sates in the of [sic] $96,295.15. This amount must be paid." November 17, 2011 Letter. DOL-SOL also rejected Eisenberg's offer of monthly payments because it would "clearly result in payment being completed well beyond one year." *Id.* The letter explained, "Payments are typically made within 30 days of completion (see 20 C.F.R. §§ 10.715 & 10.716) but this office can allow an installment plan of up to a year." *Id.* The letter notified Eisenberg that he had two options: he could (1) "submit payment of the $96,295.15 within thirty days," or (2) "submit an initial payment of $52,900.45 within 30 days with continuing monthly payment to pay the balance of $43,394.70 within one calendar year." *Id.* Lastly, the letter warned Eisenberg that "[f]ailure to make payment in either of these two ways will result in this matter being forwarded to Treasury for collection or referral to the U.S. Department of Justice to bring action against you, your firm and your client." *Id.*

The following month, by letter dated December 19, 2011, Eisenberg requested "a formal meeting" with Gordon and DOL-SOL "regarding the overpayment issue your office has caused my client." Def.'s Mem., Ex. L ("December 19, 2011 Letter"), ECF No. 84-11. In the letter, Eisenberg accused the government of "nonfeasance" and alleged that any payments to Thompson over the amount of $52,900.45—the amount which Eisenberg had set aside from the settlement to pay the government—were "separate overpayment[s] caused by your office" that "have nothing to do with our settlement notification." Id. According to Eisenberg, the government had failed to stop making payments to Thompson, who "had no reason due to your inaction to believe that he was not entitled to these monies." Id. Eisenberg thus alleged that any amount over $52,900.45 fell outside the scope of Section 8132 and the government was not entitled to recoup those funds. Id.

On March 12, 2012, Eisenberg met with Alexandra A. Tsiros, Counsel for FECA Subrogation at DOL-SOL, and the Deputy Associate Solicitor. See Pl.'s Mem., Ex. 6 ("July 31, 2012 Letter"), ECF No. 26-7; Def.'s Mem., Ex. N ("July 31, 2012 Letter"), ECF No. 84-12. Tsiros memorialized the discussion during the March 12, 2012 meeting in a letter to Eisenberg, dated July 31, 2012, making yet another demand for payment. Id. Notably, the letter reflected that Eisenberg "stated during the meeting in our office that the settlement funds had already been used to purchase an annuity for your client, and, as a consequence, your client does not have sufficient income to reimburse the government." Id. The letter warned that, "[b]ecause it is apparent that you distributed funds to your client and paid yourself an attorney's fee of $101,250.00 without paying the refund due to the United States under § 8132, you have established that you are liable to the government for the full amount of the refund." Id.

On August 12, 2012, in an email to Tsiros, Eisenberg offered to settle the matter, on behalf of Thompson, for the $52,000 retained from the settlement and $500 monthly payments "until the rest is paid off."  Def.'s Mem., Ex. N(2), ECF No. 84-13.  Tsiros responded that she would review the offer, discuss it with the appropriate parties, and "get back to you as soon as possible."  *Id.*  The record does not reflect any follow-up communication between Eisenberg and Tsiros.

On September 24, 2012, Eisenberg emailed Marcia Harris at DOL requesting "a sit-down meeting with you and your supervisors" regarding "some new information [that] may have come to light that needs to be properly addressed."  Def.'s Mem., Ex. O, ECF No. 84-14.  The record reflects no such meeting or further communication until December 14, 2012, on which date Tsiros sent Eisenberg a letter representing DOL-SOL's "final attempt to collect this debt before referring the matter to the Department of the Treasury for collection."  Pl.'s Mem., Ex. 7 ("December 14, 2012 Letter"), ECF No. 26-8; Def.'s Mem., Ex. P ("December 14, 2012 Letter"), ECF No. 84-15.  In response, on January 13, 2013, Eisenberg emailed Tsiros and conceded that "send[ing] this matter to DOJ/IRS" "is the only remaining path based on your correspondence."  Def.'s Mem., Ex. Q, ECF No. 84-16.

### D.    Instant Lawsuit

The United States filed the Complaint in this matter on October 24, 2013, seeking recovery solely from Eisenberg of $96,295.15 under § 8132 of the FECA.  Compl. ¶ 1.[6] Eisenberg then joined Thompson as a third-party defendant.  Compl. & Mot. to Join Gregory Thompson & Clarisse Thompson as Third-Party Defs. ("Third-Party Compl."), ECF No. 10.[7]

---

[6]    Eisenberg's Answer asserts affirmative defenses of contributory negligence, mistake of fact, and failure to join all relevant parties.  *See* Answer, ¶¶ 18–20, ECF No. 8.

[7]    Thompson's wife, Clarisse Thompson, who was also joined as a third-party defendant, was later dismissed without prejudice.  *See* Minute Order (Feb. 24, 2015).

On March, 12, 2014, Thompson answered the third-party complaint and counterclaimed against Eisenberg for negligence and breach of contract, alleging that Eisenberg "negligently failed to protect the lien asserted by the United States," and "charged [him] a fee of more than $200,000.00 for his services, . . . [which] included protecting and clearing any and all liens claims by the United States."  Third-Party Def.'s Counterclaim Against Michael Eisenberg ("Thompson's Counterclaim") at ¶¶ 4, 6, ECF No. 18.

After unsuccessful mediation of the dispute,[8] and at the request of the United States and Thompson, *see* Joint Status Report, ECF No. 24, discovery was stayed until the resolution of any pre-discovery dispositive motions, *see* Minute Order (June 3, 2014).  The United States subsequently filed, on June 11, 2014, its pending dispositive motion, ECF No. 26.

Eisenberg then took approximately nine months, until March 23, 2015, after multiple extensions of time, *see* Minute Order (June 24, 2014); Minute Order (July 9, 2014); Minute Order (March 6, 2015), to complete the submission of his opposition to the United States' motion, *see* ECF Nos. 83-85.  In the interim, he filed approximately twelve additional motions, including motions to file cross-claims against three additional third-parties—a legal malpractice insurance company and two insurance brokers, *see* ECF Nos. 31–32, a motion to stay the dispositive motions schedule, *see* ECF No. 37, a motion for leave to file amended cross-claims against Thompson and his wife, *see* ECF No. 63, five motions for extensions of time related to those motions, *see* ECF Nos. 52–54, 67–68, and his pending motion to file counterclaims against

---

[8]     At the parties' request, the Court referred the case to a Magistrate Judge for settlement negotiations during April and May, 2014.  Order (Apr. 2, 2014), ECF No. 21; *see also* Minute Entry (Apr. 15, 2014); Minute Entry (May 28, 2014); Joint Status Report at 1, ECF No. 24.

the United States, ECF No. 62, for selective prosecution, *per se* discrimination, denial of due process and notice, and civil conspiracy, *see* Def.'s Proposed Counterclaim ¶¶ 21–45.[9]

Eisenberg withdrew two of those motions, *see* ECF Nos. 72, 78; Minute Order (Feb. 2, 2015); Minute Order (Feb. 23, 2015), and the Court held a hearing on the remaining substantive motions on February 11, 2015, *see* Minute Entry (Feb. 11, 2015); Minute Order (Feb. 11, 2015). Eisenberg then stipulated to the dismissal of the third-party insurance companies, *see* ECF No. 80, Minute Order (Feb. 23, 2015), and the Court denied his motion to stay, ordering that he respond to the United States' dispositive motion by March 11, 2015, *see* Minute Order (Feb. 26, 2015).

After yet another extension of time, *see* Minute Order (March 6, 2015), Eisenberg finally submitted opposition papers, *see* ECF Nos. 83–85, and then, on March 29, 2015, filed his pending motion to amend his Answer, ECF No. 86, to add two additional affirmative defenses— estoppel and selective prosecution, *see* Def.'s Proposed Answer at ¶¶ 21–22.[10]

## II.   DISCUSSION

The Court first discusses the applicable statutory and regulatory framework and then addresses Eisenberg's two motions to amend his pleadings before turning to the United States' dispositive motion, for which the record is sufficient for a decision on the merits in favor of the United States.

---

[9]   Eisenberg's motions for extensions of time were granted. *See* Minute Order (Sept. 9, 2014); Minute Order (Sept. 16, 2014); Minute Order (Sept. 22, 2014); Minute Order (Feb. 2, 2015).

[10]   Upon the parties' request, the Court temporarily stayed the dispositive motions schedule pending resolution of Eisenberg's two remaining motions to amend his answer and file counterclaims against the United States. *See* Minute Order (Apr. 8, 2015). Since Eisenberg's two motions are resolved in this Memorandum Opinion, the Court hereby lifts the stay.

### A.        Section 8132 Statutory and Regulatory Framework

Under the FECA, federal employees may receive compensation for injuries sustained while performing their employment duties.  *See* 5 U.S.C. § 8102; *United States v. Lorenzetti*, 467 U.S. 167, 168 (1984) ("The [FECA], 5 U.S.C. § 8101 *et seq.*, provides a comprehensive system of compensation for federal employees who sustain work-related injuries.").  When an employee is entitled to receive compensation under the FECA but "a person other than the United States" is legally liable for the employee's injuries, "the Secretary of Labor *may* require" the employee to "assign to the United States any right of action" he has to enforce the third-party liability or to "prosecute the action in [the employee's] own name."  5 U.S.C. § 8131 (emphasis added).  Regardless of any action by the Secretary of Labor, however, a FECA beneficiary who "receives money or other property" for third-party liability "as the result of suit or settlement by him or in his behalf," must refund to the United States, "after deducting therefrom the costs of suit and a reasonable attorney's fee," the compensation that the United States paid to the beneficiary and "credit any surplus on future payments of compensation payable to him for the same injury."  5 U.S.C. § 8132; *see Lorenzetti*, 467 U.S. at 168 ("As part of [the FECA] system, an employee who receives FECA payments is required to reimburse the United States for those payments, to a specified extent, when he obtains a damages award or settlement from a third party who is liable to the employee for his injuries."); *Gonzalez v. Dep't of Labor*, 603 F. Supp. 2d 137, 141 (D.D.C. 2009) ("[R]egardless of whether the Secretary requires the filing of a lawsuit, a FECA beneficiary who receives compensation through a third-party lawsuit must reimburse Labor for federal funds already paid to the beneficiary as compensation for an injury."), *aff'd*, 609 F.3d 451 (D.C. Cir. 2010).

Section 8132, moreover, expressly directs that "[n]o court, insurer, attorney, or other person shall pay or distribute to the beneficiary or his designee the proceeds of such [third-party] suit or settlement without first satisfying or assuring satisfaction of the interest of the United States." 5 U.S.C. § 8132; *see Lorenzetti*, 467 U.S. at 171 n.2 ("Section 8132 . . . provides that no person shall make distribution to an employee pursuant to a damages judgment or settlement without first satisfying the United States' reimbursement interest.").[11]  The Eighth Circuit explained that "this sentence was added to expedite reimbursement by granting the government a lien on the proceeds of any third party recovery to the extent of the government's reimbursement rights" such that "[a]ny person who deals with funds against which the government has a lien under section 8132 is thus liable to the United States for conversion." *Green v. U.S. Dep't of Labor*, 775 F.2d 964, 970 (8th Cir. 1985).  Consequently, this provision creates joint and several liability for the FECA beneficiary and his attorney.  *Id.*; *see also United States v. Epstein*, No. 2:06cv656, 2007 WL 2617174, at *9 (W.D. Pa. Sept. 6, 2007) ("In applying *Lorenzetti*, the Court of Appeals for the Eighth Circuit held that the plain language of § 8132 creates joint and

---

[11] Section 8132 provides, in full:

> If an injury or death for which compensation is payable under this subchapter is caused under circumstances creating a legal liability in a person other than the United States to pay damages, and a beneficiary entitled to compensation from the United States for that injury or death receives money or other property in satisfaction of that liability as the result of suit or settlement by him or in his behalf, the beneficiary, after deducting therefrom the costs of suit and a reasonable attorney's fee, shall refund to the United States the amount of compensation paid by the United States and credit any surplus on future payments of compensation payable to him for the same injury.  No court, insurer, attorney, or other person shall pay or distribute to the beneficiary or his designee the proceeds of such suit or settlement without first satisfying or assuring satisfaction of the interest of the United States.  The amount refunded to the United States shall be credited to the Employees' Compensation Fund.  If compensation has not been paid to the beneficiary, he shall credit the money or property on compensation payable to him by the United States for the same injury.  However, the beneficiary is entitled to retain, as a minimum, at least one-fifth of the net amount of the money or other property remaining after the expenses of a suit or settlement have been deducted; and in addition to this minimum and at the time of distribution, an amount equivalent to a reasonable attorney's fee proportionate to the refund to the United States.

5 U.S.C. § 8132.

several liability on the part of the FECA recipient and his attorney.").  Similarly, the Ninth

Circuit recognized that "[t]he legislative history of the [provision] indicates that this language

creates a lien on the recovery."  *United States v. Limbs*, 524 F.2d 799, 803 (9th Cir. 1975).

Accordingly, "[a]n attorney . . . who receives settlement from a third party tortfeasor . . . has an

explicit duty to reimburse the federal government before paying his clients."  *Id.*

The scope of § 8132 is broad:  "it expressly creates a general right of reimbursement" and

should not "be construed to diminish the scope of the United States' reimbursable interest when

a third-party action is maintained by the employee himself."  *Lorenzetti*, 467 U.S. at 174, 176.

As the Supreme Court explained:

> Section 8132 imposes only two conditions precedent to an employee's obligation
> to "refund . . . the amount of compensation paid by the United States."  The first
> is that the employee must have suffered an injury or death under circumstances
> creating a legal liability in a third party to pay damages.  The second is that the
> employee or his beneficiaries must have received money or other property in
> satisfaction of that liability.

*Id.* at 173–74; *see Gonzalez*, 609 F.3d at 456 (recognizing the "only two conditions precedent to

a FECA beneficiary's reimbursement obligation").

The governing regulations are consistent with the statute.  Under the regulations, a FECA

claimant "*can* be required to take action," by OWCP or DOL-SOL, against a third party who

wholly or partially caused the claimant's injuries.  20 C.F.R. § 10.705 (emphasis added).

Regardless of whether the claimant is required by the agency to take action, however:

> [a]ny person who has filed a FECA claim that has been accepted[,] . . . is required
> to notify OWCP or [DOL-SOL] of the receipt of money or other property as a
> result of a settlement or judgment in connection with the circumstances of that
> claim . . . . in writing within 30 days of the receipt of such money or other
> property or the acceptance of the FECA claim, whichever occurs later.

20 C.F.R. § 10.710.  The regulations also prescribe the amount of money that the FECA

beneficiary is entitled to keep from any third-party recovery and explain, in detail, how the

amount that must be paid to the United States is to be calculated.  *See* 20 C.F.R. §§ 10.711–10.715.

### B.     Defendant's Motions to Amend His Pleadings

Eisenberg seeks to file counterclaims against the United States for (1) selective prosecution, (2) *per se* discrimination, (3) denial of due process and notice, and (4) civil conspiracy, alleging that the United States "selectively enforced this pending action against him because of his religion, race, gender and disability status," conspired with the Thompsons to collect funds from him, and failed to "follow its own regulations."  Def.'s Proposed Counterclaim ¶¶ 1–3; *see id.* ¶¶ 21–28 ("Count I – Selective Prosecution of Defendant Eisenberg"), 29–35 ("Count II – *Per Se* Discrimination"), 36–42 ("Count III – Denial of Due Process and Notice"), 43–45 ("Count IV – Conspiracy to Make Mr. Eisenberg Solely Liable").  He seeks both injunctive relief, in the form of "[a]n immediate dismissal (with prejudice) of the pending lawsuit against" him, *id.* ¶ 46, and money damages of twelve million dollars, plus fees and costs, *id.* at ¶ 47.  Eisenberg similarly seeks to amend his answer to assert the affirmative defenses of estoppel and selective prosecution.  *See* Def.'s Proposed Answer ¶¶ 21–22.  As support for these additional defenses, Eisenberg alleges that the government is "estopped from taking this action due to its failure to carry out its mandatory duties under the DOL's guidelines," and is "selectively prosecuting the Caucasian, Jewish, Childless person who is not totally and permanently disabled versus the non Caucasian, non Jewish, person with Children who is totally and permanently disabled."  *Id.*

### 1.     *Legal Standard*

The same legal standard applies to both of the defendant's motions.  Generally, a party must assert in its responsive pleading any counterclaim against an opposing party when it "arises

out of the transaction or occurrence that is the subject matter of the opposing party's claim."
FED. R. CIV. P. 13(a).  Courts have recognized, however, that "[t]wo rules govern adding a
counterclaim after the initial pleadings have been filed[,]" Rule 13(e) and Rule 15(a).  *United
States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 893 F. Supp. 2d 258, 263 (D.D.C.
2012).  Rule 13(e) governs counterclaims which arise after responsive pleadings have been filed,
*see id.* at 263–64, authorizing a court to "permit a party to file a supplemental pleading asserting
a counterclaim that matured or was acquired by the party after serving an earlier pleading," FED.
R. CIV. P. 13(e).  Rule 15(a)(2), on the other hand, governs counterclaims which a party should
have, but did not, file in its responsive pleadings.  *See Westrick*, 893 F. Supp. 2d at 263; FED. R.
CIV. P. 15 advisory committee's note to 2009 amendment (explaining Rule 15 "govern[s]
amendment of a pleading to add a counterclaim").

> Because of the timing and nature of the counterclaims that Eisenberg seeks to assert, the
Rule 15 standard applies to his motion to assert counterclaims.  Eisenberg's proposed
counterclaims arise from the United States allegedly targeting and prosecuting him in this matter,
*see* Def.'s Proposed Counterclaim ¶¶ 22, 26–27, 32–34, 45, and "fail[ing] to follow its own rules
of process prior to initiating this present suit," *id.* ¶ 38.  These claims had clearly already arisen
at the time he served his responsive pleading, and he was required to state them in his responsive
pleading.  *See* FED. R. CIV. P. 13(a).  Since he should have asserted his counterclaims in his
responsive pleading but failed to do so, Eisenberg's instant motion is evaluated under Rule
15(a)(2) as a motion for leave to amend his responsive pleading.  The same standard applies to
his motion to amend his answer.

> While Rule 15(a), which generally governs all amendments to pleadings, authorizes
amendments to pleadings before trial "as a matter of course" within certain prescribed periods,

*see* FED. R. CIV. P. 15(a)(1), "[i]n all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave," FED. R. CIV. P. 15(a)(2).[12]  "The court should freely give leave [to amend] when justice so requires," *id.*, but "the grant or denial of leave to amend is committed to a district court's discretion," *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996); *see Foman v. Davis*, 371 U.S. 178, 182 (1962), and should be determined "on a case by case basis," *Harris v. Sec'y, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 344 (D.C. Cir. 1997).  The Supreme Court has explained:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman*, 371 U.S. at 182; *Harris*, 126 F.3d at 344.

While that standard is "generous," *Harris*, 126 F.3d at 344, "[u]ndue delay, undue prejudice to the defendant or futility of the proposed amendment are factors that may warrant denying leave to amend," *Westrick*, 893 F. Supp. 2d at 264 (citing *Richardson v. United States*, 193 F.3d 545, 548–49 (D.C. Cir. 1999)); *see also Foman*, 371 U.S. at 182; *Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2012) (citing *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996)).  When a party cannot allege adequate facts to state a claim, or the amended pleading would not survive a motion to dismiss, a court acts within its discretion in denying leave to amend a pleading as futile.  *See Rollins v. Wackenhut Servs., Inc.*,

---

[12]  Eisenberg argues that he should be permitted to amend his Answer as a matter of course.  Def.'s Mem. Supp. Opposed Mot. Amend Answer ("Def.'s Answer Mem.") at 7, ECF No. 86-1.  He is wrong.  Under Rule 15(a)(1), "[a] party may amend its pleading once as a matter of course within: (A) 21 days after serving it or, (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  FED. R. CIV. P. 15(a)(1).  An Answer is a pleading to which no responsive pleading is required.  *See* FED. R. CIV. P. 7(a) (allowing a reply to an answer only "if the court orders one").  Thus, Eisenberg was permitted under the rules to amend his pleading as a matter of course only within twenty-one days after serving it.  He filed the Answer, ECF No. 8, on January 27, 2014, and, consequently, was entitled to amend it as a matter of course only until February 17, 2014.

703 F.3d 122, 131 (D.C. Cir. 2012); *Hettinga*, 677 F.3d at 480; *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 218 (D.C. Cir. 2010).

Here, both the undue delay and the futility of Eisenberg's proposed counterclaims and amendments warrant denial of his motions.

### 2. *Undue Delay*

Eisenberg was given over six months from the time he filed his Answer to amend his pleadings, and he was on clear notice of the final deadline to do so. After the Complaint, ECF No. 1, was filed on October 23, 2013, Eisenberg was granted a two-week extension to file his answer, *see* Minute Order (Jan. 13, 2014), as well as permission to file a third-party claim against Thompson, *see* Minute Order (Feb. 14, 2014). In an untimely Joint Meet and Confer Report ("JMCR"), ECF No. 14, which was filed by the parties only after prompting by the Court's order to show cause why the parties failed to submit the report as required, *see* Minute Order (Feb. 28, 2014), the "parties recommend[ed] that all other parties shall be joined and the pleadings amended by July 1, 2014," JMCR ¶ 2. An order consistent with the parties' recommendation was entered. *See* Minute Order (Mar. 7, 2014). On April 2, 2014, the parties filed a Supplemental Joint Meet and Confer Report, ECF No. 20, recommending the same July 1, 2014 deadline for amendments to pleadings, *id.* ¶ 2, which deadline gave the parties a generous six months from the filing of the Complaint to amend their pleadings.

Despite this generous period of time for any amendments to pleadings, Eisenberg filed his Motion for Leave to File Counterclaim Against the United States of America, ECF No. 62, on November 13, 2014, over a year after the Complaint was filed, eleven months after he had filed his Answer, and approximately five months after the deadline (of July 1, 2014) to submit amended pleadings had passed. Eisenberg then filed his Motion to Amend Answer, ECF No. 86,

on March 29, 2015, over one and a half years after the Complaint was filed, fifteen months after

he had filed his Answer, and approximately nine months after the deadline (of July 1, 2014) to

submit amended pleadings had passed.

At the outset, Rule 16 of the Federal Rules of Civil Procedure provides that a court's

scheduling order "may be modified only for good cause and with the judge's consent." FED. R.

CIV. P. 16(b)(4). Accordingly, courts have held parties to this higher "good cause" standard on

motions to amend pleadings where scheduling orders to amend pleadings were in place. *See A*

*Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 292 F.R.D. 142, 143–44 (D.D.C. 2013)

(citing cases). To determine whether good cause exists, courts consider, first and foremost, the

diligence of the moving party, "focus[ing] on the timeliness of the amendment and the reasons

for its tardy submission." *Id.* at 144 (quoting *Lurie v. Mid-Atl. Permanente Med. Grp., P.C.*, 589

F. Supp. 2d 21, 23 (D.D.C. 2008)). Eisenberg argues that his proposed affirmative defenses are

"essential for a just adjudication of this case," and that he did not "become aware of the possible

discriminatory motives of the other parties" until after their settlement discussions, noting that

"as a solo-practitioner receiving a lawsuit from the might of the United States government, [he]

is at a slight disadvantage to his opposing counsel's resources." Def.'s Reply Pl.'s Opp'n Def.'s

Mot. Amend Answer ("Def.'s Reply") at 2–3, ECF No. 89. Despite his numerous filings in this

case before ever seeking to amend his pleadings, Eisenberg also emphasizes that he has not filed

repeated motions to amend or acted in bad faith. *Id.* at 3. As discussed below, the Court can

discern no good reason to modify the July 1, 2014 deadline for the parties to amend pleadings,

*see* Minute Order (Mar. 7, 2014), or to excuse the delays in Eisenberg's proposed amendments to

his pleadings.

21

Eisenberg offers absolutely no explanation, and the Court cannot infer any, for his delay in filing his proposed counterclaims.  With respect to the proposed amendments to his Answer, Eisenberg posits that he learned the information related to the proposed affirmative defenses of estoppel and selective prosecution only after he filed his Answer, Def.'s Mem. Supp. Opposed Mot. Amend Answer ("Def.'s Mem. Answer") at 6–7, ECF No. 86-1; Def.'s Reply at 3, but his justification makes little sense.  Eisenberg's estoppel defense arises almost entirely from DOL's alleged failure to follow its own internal procedures *before* the United States filed the present suit.  *See* Def.'s Reply at 7–9.  Likewise, the selective prosecution defense arises from the prosecution of the present suit, *see* Def.'s Proposed Answer ¶ 22, which plainly occurred before Eisenberg filed his Answer.

Eisenberg also attempts to justify the delay by indicating that during his settlement discussions with the government, which occurred in April and May, 2014, he "became *more* enlightened as to the possible discriminatory motives of the Parties," Def.'s Mem. Answer at 4 (emphasis added); *see also* Def.'s Reply at 3 (asserting that "it was not until this mediation process that [Eisenberg] became aware of the possible discriminatory motives of the other parties").  Yet, even if this were true, he offers no explanation for why he waited another six months, until November 2014, to seek leave to amend his answer.  Delay alone would warrant denial of Eisenberg's motions to amend his answer and to assert counterclaims.

### 3.    *Futility of Amendments*

Regardless of the delay, the defendant's proposed amendments to his pleadings would be futile. [13]

---

[13]    To the extent that Eisenberg seeks monetary damages for his proposed counterclaims, "suits for damages against the United States under the Civil Rights Act, the APA, and the Constitution are barred by sovereign immunity and . . . suits for damages against the United States under the common law must be brought pursuant to the limited waiver of sovereign immunity in the FTCA, which requires that the claimant have exhausted his

a.      *Selective Prosecution/Per Se Discrimination*

Eisenberg seeks to add selective prosecution as an affirmative defense in his Answer, *see* Def.'s Proposed Answer ¶ 22, and as a counterclaim, *see* Def.'s Proposed Counterclaim ¶¶ 21–28, and to add *per se* discrimination as a counterclaim, *see id.* ¶¶ 29–35.  The defendant's proposed counterclaims for selective prosecution and *per se* discrimination are substantively the same:  he alleges that the government prosecuted him, instead of and without including the Thompsons as defendants, because he is "a Jewish, white male who is not totally and permanently disabled, and childless" "[w]hile the Thompsons are non-Jewish, African American individuals with dependents" and "Mr. Thompson is totally and permanently disabled due to a Federal-Government work related injury."  Def.'s Proposed Counterclaim ¶ 25; *see id.* ¶ 32 (alleging that the government "discriminated against [him] by choosing solely to bring this action against [him] based on his race, religious background, gender (childless) and disability status even though the Thompsons are in a similar circumstance").  Additionally, "the relevant case law makes no distinction between 'selective' and 'discriminatory' prosecution." *Office of Foreign Assets Control v. Voices in the Wilderness*, 329 F. Supp. 2d 71, 82 n.8 (D.D.C. 2004) (citing *United States v. Bass*, 536 U.S. 862, 863 (2002); *United States v. Diggs*, 613 F.2d 988, 1003 (D.C. Cir. 1979)).  Accordingly, the Court considers the defendant's proposed selective prosecution and *per se* discrimination counterclaims to be one single claim of selective prosecution.  *Id.*

---

administrative remedy before filing suit." *Benoit v. U.S. Dep't of Agric.*, 608 F.3d 17, 20 (D.C. Cir. 2010); *see also Lane v. Pena*, 518 U.S. 187, 192 (1996) ("To sustain a claim that the Government is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims."); *Keene Corp. v. United States*, 700 F.2d 836, 845 n.13 (2d Cir. 1983) (explaining that "FECA does not constitute a waiver of sovereign immunity as to third parties").  The United States correctly points out, *see* Pl.'s Opp'n Def.'s Mot. File Counterclaim ("Pl.'s Opp'n Counterclaim") at 6–11, ECF No. 64, that Eisenberg asserts no basis to overcome the United States' sovereign immunity to obtain the monetary damages relief sought on his proposed counterclaims.

The standard to prove a selective prosecution claim "is a demanding one," *United States v. Armstrong*, 517 U.S. 456, 463 (1996), as government prosecutors have "broad discretion" for their prosecution decisions, *id.* at 464 (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985)).  The Supreme Court has explained:

> This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review.  Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

*Wayte*, 470 U.S. at 607.  To prove selective prosecution, a claimant must show that (1) the prosecution "had a discriminatory effect," and (2) "that it was motivated by a discriminatory purpose."  *Id.* at 608; *see Armstrong*, 517 U.S. at 465.  "To establish a discriminatory effect . . . , the claimant must show that similarly situated individuals of a different [protected class] . . . were not prosecuted."  *Armstrong*, 517 U.S. at 465; *see Fog Cutter Capital Grp. Inc. v. SEC*, 474 F.3d 822, 826 (D.C. Cir. 2007) ("To prove selective prosecution, a claimant must be part of a protected class . . . and show not only that prosecutors acted with bad intent, but also that 'similarly situated individuals [outside the protected category] were not prosecuted.'" (alteration in original) (quoting *Armstrong*, 517 U.S. at 465)); *United States v. Blackley*, 986 F. Supp. 616, 617–18 (D.D.C. 1997) ("[C]harges may be dismissed on the basis of selective prosecution if a defendant is (1) singled out for prosecution from among others similarly situated and (2) the prosecution is improperly motivated, *i.e.* based on an arbitrary classification.").

Eisenberg fails to state a claim for selective prosecution because he does not allege sufficient facts to show he was similarly situated to an individual who was not prosecuted. Eisenberg compares himself to Thompson, his former client, asserting that the government selectively prosecuted him instead of Thompson, despite the fact that both of them are subject to

liability under § 8132.  *See* Def.'s Proposed Counterclaim ¶ 26 ("Plaintiff failed to bring in the Thompsons into the core 'Complaint' even though they are jointly and severally liable for collection of any relevant moneys . . . ."); Def.'s Reply at 6 ("In this case, Mr. Thompson and Mr. Eisenberg were each parties that could be recovered from under statute.").  Eisenberg and Thompson, however, are not similarly-situated for the simple reason that Eisenberg is an attorney and Thompson is not.

Eisenberg argues that the law is not so stringent as to require that he show he is similarly situated "in every relevant aspect to a comparator who was treated differently," and urges the Court to apply a less "demanding" standard and "common-sense inquiry."  Def.'s Reply at 4–5. Common-sense, however, suggests that Eisenberg cannot prevail.  Eisenberg has not alleged, nor has he provided any indication that he could allege, that the United States declined to pursue any other attorney, as opposed to beneficiary, under a similar obligation to repay the United States after a FECA beneficiary's recovery from a third party under 5 U.S.C. § 8132.  Accordingly, Eisenberg's counterclaim for selective prosecution, or *per se* discrimination, would not survive a motion to dismiss and granting him leave to file the counterclaim would be futile.  For the same reasons, granting Eisenberg leave to amend his Answer to include selective prosecution as an affirmative defense would also be futile.

Moreover, and perhaps more significantly, Eisenberg can show no harm or damage whatsoever from the United States' decision to prosecute him and not Thompson.  Eisenberg recognizes that he and Thompson are "each parties that could be recovered from under the statute," Def.'s Reply at 6, and, thus, that he and Thompson are jointly and severally liable to the United States.  He therefore could, and did, join Thompson in the suit.  Had the reverse occurred—had the United States decided to prosecute only Thompson, Thompson could have,

and likely would have, joined Eisenberg.  Since Eisenberg would be potentially liable for the
United States' funds regardless of whether the United States sued Thompson, he cannot, as a
matter of law, have been harmed by the United States' alleged "selective prosecution" of him.
*Accord Green*, 775 F.2d at 970 n.6 ("[A] party found jointly and severally liable . . . 'cannot
compel the plaintiff [the government] to make others parties to the action, or complain because
they have not been joined.'" (alteration in original) (quoting W.P. KEETON, PROSSER AND
KEETON ON THE LAW OF TORTS § 47, at 327 (5th ed. 1984))).

Eisenberg's attempt to distinguish *Green*, *see* Def.'s Mem. at 24–25, which he asserts is
"simply wrong," *id.* at 24, is unavailing.  Eisenberg argues that *Green* "fails to follow
Congressional intent" because, in enacting § 8132, Congress intended to prevent "windfall[s]" or
double recoveries for FECA beneficiaries.  *Id.* at 24.  Eisenberg misreads *Green*.  The *Green*
court concluded, based on "an examination of the legislative history of the United States' right of
reimbursement under the FECA[,] . . . that Congress intended that a party held liable under the
lien language of section 8132 be entitled to reimbursement from the beneficiary of the FECA
payments and the third party recovery."  775 F.2d at 972 n.9.  Indeed, the court found that
"[c]learly, Congress intended that the beneficiary of the FECA payments and the third party
recovery must bear the ultimate burden of reimbursement."  *Id.* at 972.  As a result, the court
held "that a party liable to the United States under the lien language of section 8132 is generally
entitled to indemnity from the ultimate beneficiary."  *Id.*  Here, nothing is stopping Eisenberg
from seeking indemnity or contribution from Thompson, against whom he has already filed a
third-party complaint.

**b.**     ***Denial of Due Process and Notice ("Accardi Claim") and Estoppel***

Eisenberg seeks to bring a counterclaim for denial of due process and notice based on allegations that DOL failed to comply with its internal procedures and guidelines, *see* Def.'s Proposed Counterclaim ¶¶ 36–42, and seeks to add the affirmative defense of estoppel on the same grounds, alleging that DOL's failure to follow its internal procedures and guidelines bars the government from recovering any money from him, *see* Def.'s Proposed Answer ¶ 21; *see also* Def.'s Proposed Counterclaim at 19 ¶ m ("Failure to provide the required due process not only violates Defendant's rights but also bars the Government from any form of recovery from Defendant."); Def.'s Reply at 7–10 (arguing the government "did not comply" with the "extensive list of processes and procedures that are to be followed when an OWCP claim is to be reimbursed by a third party lawsuit").  Eisenberg's claims are meritless.

Eisenberg's proposed counterclaim is purportedly an "*Accardi* claim."  The Supreme Court's decision in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ("*Accardi*"), "has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others."  *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005). Citing to various provisions of an internal DOL procedure manual, *see* U.S. DEP'T OF LABOR, DIV. OF FED. EMP. COMP. PROCEDURAL MANUAL ch. 2-1100 (Mar. 2006) ("FECA Third Party Subrogation Guidelines"),[14] Eisenberg makes numerous allegations that the United States "failed to follow its own rules of process," Def.'s Proposed Counterclaim at 9, ¶ 38.  Eisenberg's allegations, *see id.* at 8–21, ¶ 38, can be grouped as follows:  (1) the government's failure to communicate with and assist Eisenberg "prior to and during the third-party suit," *id.* at 9; *see*

---

[14]     Available at http://www.dol.gov/owcp/dfec/regs/compliance/DFECfolio/FECA-PT2/group5.htm#21100 (last visited Nov. 25, 2015).

*also id.* at 13–14, 16–17; Def.'s Reply at 7–8, including by failing to use various prescribed

"templates in its communications," Def.'s Proposed Counterclaim at 10–11; (2) the

government's failure to follow internal procedures with respect to processing the SOR and

pursuing the collection of the debt after the third-party suit, *see generally id.* at 12–15, 18–19;

and (3) the government's failure to advise the defendant of his "rights and responsibilities," *id.* at

20.

"It has long been settled that a federal agency must adhere firmly to self-adopted rules by

which *the interests of others* are to be regulated." *Mass. Fair Share v. Law Enf't Assistance

Admin.*, 758 F.2d 708, 711 (D.C. Cir. 1985) (emphasis added); *see also Morton v. Ruiz*, 415 U.S.

199, 235 (1974) ("Where *the rights of individuals are affected*, it is incumbent upon agencies to

follow their own procedures." (emphasis added)).  Where, however, "[t]he rules were not

intended primarily to confer important procedural benefits upon individuals in the face of

otherwise unfettered discretion," and where a case does not involve an agency failing to exercise

required independent discretion, the agency may "relax or modify its procedural rules adopted

for the orderly transaction of business before it when in a given case the ends of justice require

it[;]" and, such an agency action "is not reviewable except upon a showing of substantial

prejudice to the complaining party." *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532,

539 (1970) (internal quotation marks omitted).

Here, none of the guidelines about which Eisenberg complains affect the rights of

individuals or were intended to protect individuals from agency discretion.  Instead, the

procedures and guidelines that he cites involve the government's processes and procedures for

pursuing and collecting claims from third parties for benefits disbursed to beneficiaries under

FECA.  These are procedural rules intended to benefit *the government*, so that it may be

reimbursed for claims it has paid.  *See* FECA Third Party Subrogation Guidelines, ch. 2-1100.1 ("Purpose and Scope.  This subchapter outlines the *procedures for administering the government's rights* under §§ 8131 and 8132 of the FECA to require FECA claimants to seek damages from third parties potentially liable for damages as a result of the FECA-covered injuries, and to refund a portion of any money or other property recovered." (emphasis added)); *see also Lorenzetti*, 467 U.S. at 176 (explaining that § 8132 "was adopted 'not for the purpose of increasing [FECA] compensation, but for the purpose of reimbursing the Government for payments made and indemnifying it against other amounts payable in the future'" (alteration in original) (quoting *Dahn v. Davis*, 258 U.S. 421, 430 (1922))); *id*. at 177 ("[T]he purpose of § 8132 is not simply to prevent double recoveries but to minimize the cost of the FECA program to the Federal Government."); *Green*, 775 F.2d at 969 ("The Supreme Court emphasized that the primary purpose of section 8132 was to minimize the cost of the FECA program to the federal government and that this policy was furthered by construing section 8132 to create a general right of reimbursement, however harsh that result might be in a particular case.").  Thus, even assuming *arguendo* that Eisenberg sufficiently alleges that the government violated some internal rule or procedure relating to (1) assisting Eisenberg with the third-party suit, (2) collecting the debt owed, or (3) advising Eisenberg of "his rights and responsibilities," the government's actions in this case are not reviewable without a showing of substantial prejudice to the defendant.

Eisenberg cannot show such substantial, if any, prejudice.  First, Eisenberg can show no harm at all from any failure on the part of the United States to communicate with or assist him in prosecuting Thompson's third party suit because that third party suit ultimately ended in a substantial settlement recovery for Thompson and, consequently, substantial attorney's fees for

Eisenberg.  Thus, any allegations relating to the government's actions before or during the third

party suit are unreviewable.

The defense of estoppel is also unavailable with respect to these allegations.  *See*

*Gonzalez*, 609 F.3d at 459 (rejecting FECA beneficiaries' estoppel defense in § 8132 suit

because "a requirement that Labor participate in litigation in order to preserve its reimbursement

rights would be inconsistent with one of the purposes of FECA's reimbursement scheme, which

is to 'minimize the cost of the FECA program to the Federal Government.'" (quoting *Lorenzetti*,

467 U.S. at 177)); *see also Green*, 775 F.2d at 970 (holding that "the government's failure to

become involved" in the third-party suit did "not preclude it from seeking reimbursement from

[the beneficiary] or [his attorney]" because "the federal government has unfettered discretion to

determine whether to require an assignment of the beneficiary's claim under section 8131 or to

seek reimbursement from the beneficiary under section 8132"); *Mitchell v. Henderson*, 128 F.

Supp. 2d 298, 306 (D. Md. 2001) ("[Section] 8132 does not provide that the government will

actively assist or facilitate an individual plaintiff's lawsuit.  Consequently, the fact that [the

agency] did not aid [the FECA beneficiary] does not adversely affect its claim for subrogation.").

Second, Eisenberg can show no substantial harm from any failure on the part of the

United States to adhere to certain internal, discretionary debt collection procedures.  Eisenberg

specifically complains that "the Agency misrepresented to the Parties that they only had one []

year," as opposed to three years, to repay the United States after the third party suit ended.

Def.'s Proposed Counterclaim at 18, ¶ (g) (citing FECA Third Party Subrogation Guidelines, ch.

2-1100.11b(3)(a)).  Indeed, internal procedures appear to *permit* DOL-SOL to collect debt

through periodic payments within three years, *see* FECA Third Party Subrogation Guidelines, ch.

2-1100.11.b(3)(a), but the agency is not *required* to allow three years in every given

circumstance.  Thus, Eisenberg cannot show that he would be any better off had the government represented to him that it *could* provide three years for repayment, since nothing mandates that DOL-SOL, in fact, provide three years.  As Eisenberg acknowledges, the parties have had ample time to mediate this dispute and have failed to reach a settlement.  *See* Def.'s Material Facts ("Def.'s Answer Mot. SMF") at ¶¶ 5, 8, ECF No. 86-2; Answer ¶ 14 (recognizing that attempts have been made in the last five years to settle this matter); Def.'s Proposed Answer ¶ 14 (same).  DOL was not required, under its internal guidelines or otherwise, to enter a three-year payment plan to recover funds it is owed.

Third, Eisenberg cannot show substantial, if any, prejudice from any purported failure on the part of the United States to advise him of his "rights and responsibilities" as specifically prescribed in the FECA Third Party Subrogation Guidelines.  The record is replete with formal letters from DOL-SOL to Eisenberg advising him of his rights and responsibilities over an extensive period of time.  *See generally* July 19, 2011 Letter; October 4, 2011 Letter; November 17, 2011 Letter; December 19, 2011; July 31, 2012 Letter; December 14, 2012 Letter. Moreover, Eisenberg is himself an attorney and personally met with the Deputy Associate Solicitor and counsel for DOL-SOL to discuss this matter.  *See* July 31, 2012 Letter.  Eisenberg was clearly apprised of his rights and responsibilities with respect to the United States' right of recovery of FECA claims.  *See also Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 61–62 (1984) (holding, where the respondent's "detriment [was] the inability to retain money that it should never have received in the first place," the "respondent lost no rights but merely was induced to do something which could be corrected at a later time").[15]

---

[15]    The defendant relies on four cases in support of his proposed "*Accardi* claim," *see* Def.'s Mem. at 20–21, but those cases are inapposite.  In each of those cases, the agency's failure to follow its rules or regulations was found to adversely affect a party's entitlement, right, or vested property interest, which is not the case here.  For example, *Morton* involved the Bureau of Indian Affairs' denial of general assistance benefits to needy Indians,

Lastly, the affirmative defense of estoppel does not "lie against the Government as it lies against private litigants," *Millard Refrigerated Servs., Inc. v. Sec'y of Labor*, 718 F.3d 892, 897 (D.C. Cir. 2013) (quoting *OPM v. Richmond*, 496 U.S. 414, 419 (1990)), and "the bar for succeeding on such a claim is high," *id.* at 897–98; *see Heckler*, 467 U.S. at 60 ("When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined.  It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant.").  Indeed, "[t]o apply equitable estoppel against the government, a party must show that (1) there was a definite representation to the party claiming estoppel, (2) the party relied on its adversary's conduct in such a manner as to change his position for the worse, (3) the party's reliance was reasonable and (4) the government engaged in affirmative misconduct." *Morris Commc'ns, Inc. v. FCC*, 566 F.3d 184, 191 (D.C. Cir. 2009) (internal quotation marks omitted).

Eisenberg asserts that the government's "failure to properly participate in the FECA Third Party Subrogation Process," Def.'s Reply at 8, and, essentially, "assist[] [him] with reimbursement calculations," *id.* at 9 n.12, "confused" him and Thompson, *id.* at 8.  He further asserts that, "[b]ased on the Government action (or inaction)," he "changed his position and attempted the calculations himself (even though Government's lack of action gave the appearance it was not even necessary)," and "[t]his was a reasonable determination." *Id.*  This

---

thereby depriving the plaintiffs of welfare.  415 U.S. at 204. *Reuters Ltd v. FCC*, 781 F.2d 946 (D.C. Cir. 1986), involved the FCC's rescission of properly granted radio station licenses, *id.* at 947, thereby depriving the plaintiff "of a vested property interest," *Orange Park Fla. T.V., Inc. v. FCC*, 811 F.2d 664, 674 (D.C. Cir. 1987). *United States v. Heffner*, 420 F.2d 809 (4th Cir. 1969), involved the IRS' use of incriminating statements obtained in violation of internal IRS procedures in a criminal tax fraud prosecution, thereby affecting a defendant's criminal rights.  *Id.* at 811–13.  Lastly, *Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120 (D.C. Cir. 1979), involved an agency's decision affecting the plaintiff's entitlement to revenues it obtained by transporting natural gas.  *Id.* at 1122.  By contrast, here, DOL's action or inaction does not adversely affect any right, entitlement, or vested property interest belonging to Eisenberg.

argument is entirely unpersuasive, particularly in light of "the general rule that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." *Heckler*, 467 U.S. at 63.

Eisenberg cannot show any of the elements required to assert estoppel against the government. First, he acknowledges that he did not contact the government regarding the amount due to the United States before completing the SOR but, instead, obtained this information through Thompson. *See* Def.'s SMF ¶ 5 (asserting that Eisenberg requested, through Thompson "a confirmation what, if any funds, were due"); Answer ¶ 18(b)–(c); Def.'s Proposed Answer ¶ 18(b)–(c); October 8, 2010 Letter; October 14, 2010 Email. Thus, Eisenberg cannot show any representation made to him regarding the proper reimbursement calculation, let alone a "definite representation," before he disbursed the settlement proceeds. *See United States v. Honeywell Int'l, Inc.*, 841 F. Supp. 2d 112, 115 (D.D.C. 2012) (finding False Claims Act defendant "ha[d] not pointed to any definite representation by the government" to support its estoppel defense where the defendant had alleged "only a failure of the government to accept [the defendant]'s offer of test results"). Second, since no representation was ever made to Eisenberg directly, he could not have relied on such a representation. Third, any reliance of Eisenberg's on Thompson's representation to him of the government's representation to Thompson was unreasonable. As an attorney representing a FECA beneficiary, Eisenberg had a duty to familiarize himself with the legal requirements for third-party recovery and subrogation. *Cf. Heckler*, 467 U.S. at 64 ("As a participant in the Medicare program, respondent had a duty to familiarize itself with the legal requirements for cost reimbursement."). Moreover, he was privy to compensation amounts owed to the government under the FECA provided in both the Rios Declaration in the *Wackenhut* suit and in the October 2010 letter from DOL-SOL that were

completely different from the amount allegedly communicated via Thompson and incorporated into the SOR.

Fourth, the defendant does not sufficiently allege any affirmative misconduct on the part of the United States.  His allegations that the government "show[ed] extreme disregard for Mr. Thompson's claim" by "repeatedly fail[ing] to . . . assist with the third-party litigation," Def.'s Reply at 8, are of no import because, as discussed above, the defense of estoppel is unavailable with respect to these claims.  Moreover, the United States' failure to act is not "affirmative misconduct."  *See Morris Commc'ns*, 566 F.3d at 192 (holding that the agency's "three-year silence," though "egregious," "does not constitute 'affirmative misconduct'"); *Green*, 775 F.2d at 970 (holding that "the government's delay in providing a breakdown of [the beneficiary's] FECA benefits" did not "support a claim of estoppel" because "[a]lthough this delay may constitute negligence by the government, it does not rise to the level of 'affirmative misconduct' required" for an estoppel defense).

In sum, the statutes and regulations governing the United States' right of reimbursement under the FECA should have and did put Eisenberg on ample notice of the fact that he should not disburse the settlement funds without first correctly calculating the amount due to the United States and obtaining approval of the SOR.  *Cf. Heckler*, 467 U.S. at 65–66.[16]

c.     *Civil Conspiracy*

Lastly, the defendant cannot state a counterclaim for civil conspiracy.  The law is "widely accepted that a plaintiff [may] bring suit for civil conspiracy only if he ha[s] been injured by an act that was itself tortious."  *Beck v. Prupis,* 529 U.S. 494, 501 (2000) (citing 4 RESTATEMENT (SECOND) OF TORTS § 876, Comment *b* (1977) ("The mere common plan, design or even express

---

[16]     For these reasons, the defendant's request for discovery, which he argues "would be the best means to allow [him] to uncover whether there was, in fact, *affirmative* misconduct," Def.'s Reply at 8–9, is denied.

agreement is not enough for liability in itself, and there must be acts of a tortious character in carrying it into execution."); W. PROSSER, LAW OF TORTS § 46, at 293 (4th ed. 1971) ("It is only where means are employed, or purposes are accomplished, which are themselves tortious, that the conspirators who have not acted but have promoted the act will be held liable.")).  Thus, a civil conspiracy claim requires the "performance of some underlying tortious act." *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000) (quoting *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983)).  "Consistent with this principle," the Supreme Court observed that "a conspiracy claim was not an independent cause of action, but was only the mechanism for subjecting co-conspirators to liability when one of their member committed a tortious act."  *Beck*, 529 U.S. at 503; *see also Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 697 (D.C. Cir. 2009) ("[C]ivil conspiracy is not an independent tort but only a means for establishing vicarious liability for an underlying tort." (quoting *Hill v. Medlantic Health Care Grp.*, 933 A. 2d 314, 334 (D.C. 2007))); *Halberstam*, 705 F.2d at 479 (stating that civil conspiracy requires "an overt tortious act in furtherance of the agreement that causes injury" and, "[s]ince liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort").

Consequently, to establish a civil conspiracy claim, a plaintiff must adequately show an underlying tort and the following elements: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to an din furtherance of the common scheme."  *Halberstam*, 705 F.2d at 477.

In light of the fact that Eisenberg cannot make out any of the other claims he alleges, he cannot make out a claim for a civil conspiracy.  *See Executive Sandwich Shoppe, Inc.*, 749 A.2d at 738 (finding that a "civil conspiracy claim premised on" a rejected "tort theory fails as a matter of law for lack of an underlying tortious act").  Thus, allowing him to amend his pleadings to add a civil conspiracy counterclaim would be futile.

###    C.    United States' Dispositive Motion

The United States seeks (1) "partial judgment on the pleadings," pursuant to Federal Rule of Civil Procedure 12(c), on the grounds that "the uncontested facts establish [Eisenberg]'s liability for failure to reimburse the United States for amounts owed" to it under the FECA, and (2) partial summary judgment, pursuant to Federal Rule of Civil Procedure 56 and *Scott v. Harris*, 550 U.S. 372 (2007), "in favor of the United States for the total amount due according to the statutory formula, plus costs."  Pl.'s Mot. at 1.  Though somewhat confusing, it appears that the United States does not seek judgment as a matter of law as to the amount of money it is owed.  *See* Pl.'s Mem. at 11 ("Plaintiff respectfully requests that this Court order enter judgments in its favor against Defendant for the full amount of the refund due to the United States, plus costs, and *that the Court order the matter into discovery on the issue of the calculation of the refund* owed to the United States . . . ." (emphasis added)), ECF No. 26.  *But see id.* at 9 (asserting, in a heading, that "the Court Should Enter Summary Judgment On All Remaining Issues In Favor of Plaintiff").  Instead, the United States asserts that "[a]lthough it cannot be disputed that OWCP disbursed $128,393.53 to Mr. Thompson, corroborated by a print-out of OWCP's official record of the amount disbursed, there are other variables in the statutory formula that may change based upon discovery taken during the course of this action."  Pl.'s Mem. at 3 n.1.  Thus, the United States requests judgment as a matter of law "as to the issue of

liability," arguing that the defendant's Answer "admits to facts demonstrating his liability for failure to reimburse the United States for the amounts paid under FECA, but appears to dispute only the actual amounts owed." Pl.'s Mem. at 4. Similarly, the United States requests a finding, as a matter of law, that Eisenberg "is liable to the United States in the amount determined by the statute and regulations," arguing that "the formula for determining the amount of the refund is set forth in FECA" and "a detailed explanation of the calculation of damages is set forth in the Federal Regulations governing FECA." *Id.* at 5–6.

After setting out the applicable legal standards, each of the United States' requests are addressed, *seriatim*.

### 1. *Legal Standards*

Federal Rule of Civil Procedure 12(c) authorizes a party to move for judgment "[a]fter the pleadings are closed—but early enough not to delay trial." A motion for judgment on the pleadings is resolved essentially in the same manner as a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *Rollins v. Wackenhut Servs.*, 802 F. Supp. 2d 111, 116–17 (D.D.C. 2011) (citing cases), *aff'd*, 703 F.3d 122 (D.C. Cir. 2012). In deciding a motion brought under Rule 12(c), a court may not consider matters "outside the pleadings" without converting the motion to one for summary judgment. FED. R. CIV. P. 12(d).

Without triggering the conversion rule, a court may consider "only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Mpoy v. Rhee*, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)). "Because a Rule 12(c) motion would summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation, the Court must treat [the]

motion with the greatest of care . . . [,]" *Rollins*, 802 F. Supp. 2d at 117 (quoting *Baumann v. District of Columbia*, 744 F. Supp. 2d 216, 221 (D.D.C. 2010)), "accept as true the allegations in the opponent's pleadings and accord the benefit of all reasonable inferences to the non-moving party," *Stewart v. Evans*, 275 F.3d 1126, 1132 (D.C. Cir. 2002) (internal quotation marks omitted) (quoting *Haynesworth v. Miller*, 820 F.2d 1245, 1249 n.11 (D.C. Cir. 1987)).

If, on a motion under Rule 12(c), "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d); *see also Vest v. Dep't of the Air Force*, 793 F. Supp. 2d 103, 112 (D.D.C. 2011); *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 17 n.4 (D.D.C. 2011); *Strong–Fischer v. Peters*, 554 F. Supp. 2d 19, 22 (D.D.C. 2008).

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party bears the burden to demonstrate the absence of a genuine issue of material fact in dispute, while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor.  *See Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477 U.S. 242, 256–57 (1986); *Allen v. Johnson*, 795 F.3d 34 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, a reasonable jury could return a verdict for the nonmoving party") (internal quotation marks omitted); *see also* FED. R. CIV. P. 56(c), (e)(2)–(3).  "[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment[,]" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), and "[t]he evidence of the nonmovant is to be believed,

and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (quoting *Liberty Lobby,*

477 U.S. at 255).

### 2.     *Judgment on the Pleadings as to Eisenberg's Liability*

Despite Eisenberg's repeated assertions that the United States may not be owed any

money at all, *see supra* note 3, it is undisputed that Thompson received FECA benefits from the

United States and that Thompson received a settlement award from a third-party.[17]   The United

States is, therefore, indeed, owed money under § 8132 and, based on the pleadings, no genuine

issue of material fact exists with respect to Eisenberg's liability for the money that the United

States is owed.

Section 8132 makes clear that, in the event of a third-party settlement related to a FECA

claim, the United States is entitled to reimbursement of funds it paid to the beneficiary for the

FECA claim.  *See* 5 U.S.C. § 8132; *Lorenzetti,* 467 U.S. at 168 ("[A]n employee who receives

FECA payments is required to reimburse the United States for those payments, to a specified

extent, when he obtains a damages award or settlement from a third party who is liable to the

employee for his injuries."); *Gonzalez,* 603 F. Supp. 2d at 141 ("[A] FECA beneficiary who

receives compensation through a third-party lawsuit must reimburse Labor for federal funds

already paid to the beneficiary as compensation for an injury.").  The amount of the

reimbursement is specified in the statute:  the United States must be refunded "the amount of

compensation paid by the United States," minus "the costs of suit and a reasonable attorney's

fee[;]" "[h]owever, the beneficiary is entitled to retain, as a minimum, at least one-fifth of the net

amount of the money or other property remaining after the expenses of a suit or settlement have

---

[17]      Eisenberg has also acknowledged that Thompson received FECA funds in asserting that he set aside money
from the settlement with which to pay the United States, *see* Answer ¶ 14(c) (admitting that he has been willing to
provide the United States with $52,900.45, which has been set aside in his "Trust Account").

been deducted; and in addition to this minimum and at the time of distribution, an amount equivalent to a reasonable attorney's fee proportionate to the refund to the United States." 5 U.S.C. § 8132.

Additionally, § 8132 is unambiguous:  "No . . . attorney, or other person shall pay or distribute to the beneficiary or his designee the proceeds of such suit or settlement without first satisfying or assuring satisfaction of the interest of the United States."  5 U.S.C. § 8132; *see Lorenzetti*, 467 U.S. at 171 n.2 ("Section 8132 further provides that no person shall make distribution to an employee pursuant to a damages judgment or settlement without first satisfying the United States' reimbursement interest.").  Courts have recognized that "this language creates a lien on the recovery" such that "[a]n attorney . . . who receives settlement from a third party tortfeasor . . . has an explicit duty to reimburse the federal government before paying his clients." *Limbs*, 524 F.2d at 803.  Accordingly, "[a]ny person who deals with funds against which the government has a lien under section 8132 is . . . liable to the United States for conversion." *Green*, 775 F.2d at 970 (citing *Limbs*, 524 F.3d at 803).

Indeed, Eisenberg admits, as asserted in the Complaint, that "Section 8132 . . . requires that the beneficiary's counsel ensure that the United States is reimbursed, in satisfaction of its interest, before distributing any proceeds from the settlement to the beneficiary."  Compl. ¶ 12; Answer ¶ 12 ("Admit.").  Eisenberg also admits that he was jointly and severally obligated, with Thompson, "to refund" the United States "prior to the disbursement of any settlement funds to Mr. Thompson and prior to the payment of any attorney's fees," as asserted in the Complaint. Compl. ¶ 13; Answer ¶ 13 (disputing only the "amount owed"); *see also id.* ¶ 17 (admitting "in part as to the definition of § 8132" the United States' assertion that "[a] violation of Section 8132 establishes an attorney's joint and several liability for reimbursement owed to the United States,"

Compl. ¶ 17); Def.'s Mem. at 24 ("Generally speaking, the Government is entitled to, by law, seek remuneration from both Defendant and Third-Party Defendant."); Def.'s Proposed Counterclaim ¶ 18 ("5 U.S.C. § 8132 holds that both the attorney, e.g., Defendant Eisenberg, and the OWCP recipient, e.g., Defendant Thompson, in these matters can be jointly and severally liable for collection of any relevant moneys . . . .").

While Eisenberg, generally, denies "that [he] failed to reimburse the United States in satisfaction of its interest, either before or after the distribution of proceeds to Mr. Thompson," Answer ¶ 14, he does not directly dispute the United States' assertion that, "[u]pon receiving the $675,000 from the settlement, Mr. Eisenberg distributed the proceeds to Mr. Thompson, and upon information and belief, paid himself an attorney's fee," Compl. ¶ 14; Answer ¶ 14.  In an answer to a complaint, "[a] denial must fairly respond to the substance of the allegation," FED. R. CIV. P. 8(b)(2), and "[a]n allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied," FED. R. CIV. P. 8(b)(6).  Additionally, Eisenberg "admits that he has not provided Plaintiff with any additional funds," Answer ¶ 15, or, for that matter, any funds at all, *see id.* ¶¶ 14–15 (asserting that the "Plaintiff has frustrated Mr. Eisenberg's attempts to pay Plaintiff" and that he "is duty bound to maintain the . . . funds [that have been set aside] in his Trust Account"); Def.'s Mem. at 6 n.7 (noting that "he [Eisenberg] did not send them [DOL-SOL] a check, i.e., payment").

Accordingly, based on the pleadings, it is undisputed that Eisenberg is liable to the United States for whatever amount of money the government is owed under the FECA, and the United States is entitled to judgment as a matter of law on the issue of Eisenberg's liability.

In opposition to the United States' motion, aside from those arguments which the Court has already rejected, Eisenberg argues that "[n]othing in § 8132 prohibits an attorney [from]

distributing moneys in a Third-Party Suit before it distributes said money to [the] Government; §

8132 only requires the *assurance of satisfaction* which Mr. Eisenberg he did [sic] in good faith

by placing it in his trust account."  Def.'s Mem. at 3 (emphasis in original).  By Eisenberg's own

admission in his papers, however, he did nothing to assure the satisfaction.  Eisenberg asserts

that "it was not incumbent upon [him] to proactively reach out to DOL regarding a possible

subrogation payment," Def.'s Mem. at 6 n.7, and claims that he relied on Thompson to inform

him of the proper amount of reimbursement due to the United States, based on Thompson's oral

conversation with DOL, *id.* at 6 n.8.  Eisenberg further admits that he and Thompson "were

concerned that the number [the amount of benefits paid to Thompson by DOL] was changing

given the continuing payment of OWCP benefits and the status of the various appeals Mr.

Thompson had with OWCP."  *Id.*  Thus, despite his concern that "the number was changing,"

and his status as a FECA beneficiary's attorney, Eisenberg nonetheless set aside an amount of

money allegedly told to him by his client, who had obtained this information orally from a DOL

representative.[18]  This conduct does not establish assurance.  *Cf. Heckler*, 467 U.S. at 65 (finding

respondent's reliance on advice it received regarding the computation of its entitlement to federal

funds "undermined because the advice . . . was oral").

Moreover, Eisenberg set aside a particular amount, calculated based on total OWCP

disbursements to Thompson of $70,533.93, *see* June 9, 2011 Letter, even though this amount

conflicted not only with evidence in the record of the third-party lawsuit, *see Wackenhut*, Rios

Decl. ¶ 5 (attesting to disbursement amounts of $94,261.33 in disability compensation and

$29,261.33 for medical treatments as of June 6, 2009), but also written evidence provided to him

---

[18]     Eisenberg appears to blame the agency for not "redirect[ing] Mr. Thompson, a beneficiary who is
represented by counsel, . . . [to] have him have Mr. Eisenberg contact the Agency." Def.'s Mem. at 19–20. Any
fault in putting Thompson in the role of ascertaining the amount of reimbursement owed to the government rests
with Eisenberg rather than the government, however.

by Thompson, *see* October 14, 2010 Email (forwarding copy of October 8, 2010 letter and attached payment history report); October 8, 2010 Letter (attached history report showing a total disbursement amount of $94,261.33 as of June 6, 2009).[19]

Eisenberg's additional arguments in opposition to the United States' motion are also unavailing.  Eisenberg argues that, because he disbursed the settlement proceeds to Thompson, collecting money now from Eisenberg amounts to (1) "an unconstitutional tax for representing" Thompson in the third party lawsuit, (2) "a taking of personal property without compensation," and (3) "a taking of his liberty by enslaving Mr. Eisenberg to work for the Government to prosecute the matter."  Def.'s Mem. at 25–26.  The money in question belongs to the United States and Eisenberg had a duty to preserve funds from the settlement to satisfy the United States' ownership interest.  Therefore, the fact that Eisenberg is liable for the money is in no way "fundamentally inequitable, unjust and unfair," Def's Mem. at 4, even though Eisenberg avers that he no longer possesses the money.

### 3.    *Summary Judgment as to Calculation of Refund*

For the foregoing reasons, the United States is also entitled to judgment as a matter of law on the manner in which the amount owed is calculated.  Section 8132 and the related FECA regulations set forth exactly "[h]ow much of any settlement or judgment must be paid to the United States," 20 C.F.R. § 10.712, and how much the FECA beneficiary is entitled to keep, *see id.* § 10.711.  The amount of money owed to the United States must be determined by strict adherence to the FECA statute and regulations.

---

[19]    Eisenberg argues that the information provided in *Wackenhut* "was not up-to-date as of November 11, 2010, the time of the settlement."  Def.'s Mem. at 21.  He asserts that "[d]uring the course of the litigation with Wackenhut, Mr. Thompson was attempting to appeal and obtain OWCP benefits," and "[t]he parties were concerned that the calculus had changed in the 11 months between these two events."  *Id.*  These assertions indicate that, if anything, the disbursement amount would have *increased* and, thus, in no way explains the fact that Eisenberg calculated and reported a *lower* disbursement amount on the SOR.

The specific amount owed, however, is disputed.  While DOL has stated in multiple letters that OWCP paid $128,393.53 in compensation to Thompson, *see, e.g.*, July 19, 2011 Letter; August 16, 2011 Letter; October 4, 2011 Letter, a different amount was presented in the *Wackenhut* suit and earlier correspondence from DOL, *see Wackenhut*, Rios Decl. ¶ 5; October 8, 2010 Letter at 2–6 (attached report of "Compensation Payment History").  Thus, discovery is necessary to determine exactly how much money the government disbursed to Thompson for his FECA claim and how exactly to calculate, under the applicable statutes and regulations, the amount owed to the United States.[20]  Additionally, a determination on costs is premature.

Accordingly, the parties will be directed to confer and submit to the Court a proposed schedule for conducting the limited discovery necessary to resolve the issues remaining in the Complaint and the Third-Party Complaint.

## III.    CONCLUSION

For the foregoing reasons, Eisenberg's Motions for Leave to File Counterclaim Against the United States of America, ECF No. 62, and Opposed Motion to Amend Answer, ECF No. 86, are DENIED.  The United States' Motion for Partial Judgment on the Pleadings and for Partial Summary Judgment, ECF No. 26, is GRANTED IN PART and DENIED IN PART.  Specifically, the government's motion is granted as to the issue of Eisenberg's liability under 5 U.S.C. § 8132 and as to how the amount of money owed to the United States is to be calculated.

---

[20]    Eisenberg's assertion that a certain amount of the money "may relate to an 'overpayment' issue not a 'subrogation' matter," *see* Def.'s Mem. at 25, appears to pertain to the amount owed and is best addressed after discovery.  Additionally, to the extent that Eisenberg suggests that any dispute over the amount should be resolved first by the agency, rather than the Court, *see* Def.'s Mem. at 2–3 n.1, given the procedural posture of the case, the availability of administrative review is uncertain.  That said, the United States notes that "[t]he Employees' Compensation Appeals Board[] . . . is the independent administrative review body within DOL that has the statutory authority to review actions of OWCP under the FECA."  Pl.'s Mem. at 6.  Thus, if the parties agree that an administrative resolution of the issue is available and proper, they should file an appropriate motion with the Court.

This motion is denied to the extent that it seeks an entry of a judgment for the total amount of money sought in the Complaint, and as to the request for costs.

An Order consistent with this Memorandum Opinion will be contemporaneously issued.

Date: December 15, 2015

_____
BERYL A. HOWELL
United States District Judge